IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CINDY M. BROOKSHIRE,

    Plaintiff,

    vs.                                                      Civ. No. 18-1147 KK

ANDREW SAUL, Commissioner of the
Social Security Administration,

    Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Cindy M. Brookshire's ("Ms. Brookshire") Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 27) ("Motion"), filed August 8, 2019, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Ms. Brookshire's claim for Title II disability insurance benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on October 8, 2019, (Doc. 29), and Ms. Brookshire filed a reply in support of the Motion on October 15, 2019. (Doc. 30.) Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Ms. Brookshire's Motion is well taken and should be GRANTED.

### I.    BACKGROUND

Ms. Brookshire is a 60-year-old, college-educated woman who filed for disability insurance benefits on June 30, 2015, alleging a disability onset date of March 1, 2011.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 9.)

(Administrative Record ("AR") 041, 159.) From 1999 through February 2011, she worked as a medical records clerk at the Center for Orthopedics. (AR 042-44, 171-73.) She stopped working in February 2011 after her position was "eliminated," although Ms. Brookshire suspects that her employer eliminated her position to avoid firing her outright. (AR 043.) According to Ms. Brookshire, she "frightened people" that she worked with by frequently talking out loud to herself and saying "outrageous" and "inappropriate" things. (AR 046-47.)

Ms. Brookshire first started receiving "mental health services" at age nineteen after suffering "several losses." (AR 276.) In the Disability Report she completed when she applied for benefits, Ms. Brookshire reported that beginning in 1997, she received treatment for "Depression/Anxiety Situational Bi-polar PTSD [sic]" from various providers while living in Connecticut.[2] (*See* AR 195-97.) Upon relocating to New Mexico in 2013, Ms. Brookshire established care at Rio Rancho Medical Center, where she received refills for the different medications she was on at the time, including Celexa (citalopram), which was used to treat her dysthymic disorder (depression). (AR 287-289.)

In April 2015, Ms. Brookshire began treating with psychiatrist Yvonne Hall, M.D.[3] (AR 392-94.) Dr. Hall diagnosed Ms. Brookshire with posttraumatic stress disorder ("PTSD"), depressive disorder, and autism disorder, noting that Ms. Brookshire "is struggling with interpersonal deficits" and that the "course is expected to be chronic[] because of the patient's autistic component." (AR 393-94.) She continued Ms. Brookshire on her then-current treatment of citalopram for depression and PTSD (AR 394) and later augmented and modified Ms. Brookshire's medication regimen to include prazosin to treat Ms. Brookshire's nightmares (AR 390),

---

[2] The administrative record contains no medical records from any of Ms. Brookshire's providers in Connecticut.
[3] Dr. Hall recorded Ms. Brookshire's chief complaint as, "My physician is not comfortable prescribing" (AR 276), which the Court understands to mean that Ms. Brookshire's primary care physician at Rio Rancho Medical Center was no longer comfortable refilling her Celexa prescription and managing her mental health conditions.

aripiprazole to treat her increased depression, which was later switched to Latuda and then lamotrigine (AR 360-61, 367-68, 371, 381), and lorazepam for anxiety (AR 366, 371). Dr. Hall treated Ms. Brookshire on a monthly basis from April 2015 through at least March 2017, titrating her medications throughout that time depending on whether Ms. Brookshire reported improvement in her condition or increased symptoms. (AR 354, 355-94.) As early as September 2015, Dr. Hall encouraged Ms. Brookshire to consider seeing a psychotherapist, which Ms. Brookshire declined at that time because she felt it would be "overwhelming to try to talk to one." (AR 387-88.) However, Ms. Brookshire eventually agreed to see a psychotherapist and established with Elizabeth Penland, Ph.D., in December 2016. (AR 357, 420-22.)

Ms. Brookshire saw Dr. Penland eleven times between December 2016 and April 2017, or approximately every week. (AR 401-422.) In March 2017, Dr. Penland opined that Ms. Brookshire suffers from social anxiety disorder, not Asperger's Syndrome or autism. (AR 406, 407.) In April 2017, Dr. Penland diagnosed Ms. Brookshire with (1) dysthymic disorder (seasonal component and pervasive depressive disorder), (2) social anxiety disorder, (3) PTSD, (4) other specified personality disorder (mixed personality features, schizoid, avoidant, dependent personality features), and (5) specific learning disability (dyslexia) by history. (AR 402.) Also in April 2017, Dr. Penland completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) ("medical source statement") (AR 423-27) in which she indicated her opinion that Ms. Brookshire has either no or mild limitations in most areas of work-related functioning but moderate and marked limitations as follows: moderate limitations in the ability to (1) maintain attention and concentration for extended periods, (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and (3) get along with co-worker or peers without unduly distracting them or exhibiting behavioral extremes; marked limitations in the

ability to (1) interact appropriately with the general public or customers, and (2) accept instructions and respond appropriately to criticism from supervisors. (AR 424-25.) At the end of her medical source statement where asked to identify the "[d]ate of onset of the foregoing limitations[,]" Dr. Penland indicated: "Probably going back to childhood. I have not known this patient for very long. I just met her in December of 2016." (AR 427.)

The ALJ found that prior to her date last insured of December 31, 2016, Ms. Brookshire had the following severe impairments: "Autistic Disorders; Anxiety Disorders; and Affective Disorders[.]" (AR 024.) Finding that none of Ms. Brookshire's severe impairments, alone or in combination, met a Listing[4], the ALJ proceeded to assess Ms. Brookshire's residual functional capacity ("RFC") to work. (AR 024-28.) The ALJ found that Ms. Brookshire has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations:

> [Ms. Brookshire] can understand, carry out, and remember simple 1 to 3 step instructions, and make commensurate work-related decisions. She can respond appropriately to supervision, coworkers, and work situations. She can deal with routine changes in work setting. She can maintain concentration, persistence, and pace for up to and including two hours at a time, with normal breaks throughout a normal workday. She is limited to occasional superficial interaction with the general public.

(AR 026.) In discussing the medical opinion evidence vis-à-vis the RFC he assessed, the ALJ accorded "great weight" to the opinion of non-examining state agency psychologists William Farrell, Ph.D., and Joan Holloway, Ph.D., that Ms. Brookshire "retains the capacity to understand simple, one to three step instructions during an eight-hour workday." (AR 027.) He did so because he found that Drs. Farrell and Holloway "had an overview of the medical evidence, [are] familiar with Social Security disability standards, and [their] opinion[s are] well-explained." (Id.) While

---

[4] *See* 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A.

recognizing Dr. Penland as Ms. Brookshire's "treating psychologist[,]" the ALJ accorded Dr. Penland's opinions only "some weight." (Id.) The ALJ explained that Dr. Penland's opinions—specifically as to Ms. Brookshire's areas of marked limitation—were not entitled to "controlling or even great weight" because Dr. Penland had only been treating Ms. Brookshire since December 2016, which the ALJ concluded "is not long enough to establish a treatment history that would" entitle Dr. Penland's opinions to greater weight. (Id.) The other reason the ALJ gave for according only "some weight" to Dr. Penland's opinions was that "most of her treatment notes are not clear." (Id.) Other than noting that Dr. Penland's treatment notes "mention[] [Ms. Brookshire's] family history, depression and post-traumatic stress disorder" and that Dr. Penland "does not believe that [Ms. Brookshire] had either Asperger's or Autism[,]" the ALJ's decision contains no further discussion of the evidence supplied by Dr. Penland's records and medical source statement. (Id.)

Although the ALJ found that Ms. Brookshire was unable to perform past relevant work, he concluded that given her age, education, work experience, and the RFC he assessed, she would be able to perform other jobs that exist in significant numbers in the national economy. (AR 028-29.) He therefore found that Ms. Brookshire was "not disabled." (AR 029.) Ms. Brookshire sought review by the Appeals Council, which denied her request. (AR 001-6, 157-58.) Ms. Brookshire then appealed to this Court. (Doc. 1.)

## II. APPLICABLE LAW

### A. Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine

5

the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

**B.      Disability Benefits and the Sequential Evaluation Process**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). "To qualify for disability benefits, a claimant must establish a severe

physical or mental impairment expected to result in death or to last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) she is not engaged in "substantial gainful activity"; *and* (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) her impairment(s) meet or equal one of the Listings of presumptively disabling impairments; *or* (4) she is unable to perform his "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i-iv). If the claimant can show that an impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops. 20 C.F.R. § 404.1520(a)(4)(iii). If at step three the claimant's impairment is not equivalent to a listed impairment, the ALJ must next consider all of the relevant medical and other evidence and determine what is the "most [the claimant] can still do" in a work setting despite her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1)-(3). This is called the claimant's residual functional capacity. 20 C.F.R. § 404.1545(a)(1), (a)(3). The claimant's RFC is used at step four of the process to determine if she can perform the physical and mental demands of her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv), (e). If the claimant establishes that she is incapable of meeting those demands, the burden of proof then shifts to the Commissioner at step five to show that the claimant is able to perform other work in the national economy, considering her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Grogan*, 399 F.3d at 1261.

**C.     Consideration and Evaluation of Evidence**

The ALJ must consider "all relevant evidence in the case record" in making a disability determination. SSR 06-03P, 2006 WL 2329939, at *4 (Aug. 9, 2006).[5] Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss not only the evidence supporting his decision but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. The ALJ's decision must demonstrate application of the correct legal standards applicable to different types of evidence, and failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).

Regarding medical opinion evidence, the ALJ is required to discuss the weight assigned to each medical opinion of record. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 404.1527(e)(2)(ii)). Generally, the ALJ should accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. § 404.1527(c)(1); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). Indeed, a treating source's opinions are entitled to controlling weight if they are well-supported and consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). As such, when the record contains opinions from a treating source, the weighing of medical opinions proceeds

---

[5] The Court acknowledges that certain Social Security Rulings, including SSR 06-03P, that the Court relies on in its analysis have been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, Ms. Brookshire's claims were filed in 2015, making the rescinded rulings and case law interpreting them still applicable.

through a sequential process: the ALJ must first determine whether the treating source's opinions deserve controlling weight. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (describing the analysis as "sequential" and explaining that "[i]n deciding how much weight to give a treating source, an ALJ must first determine whether the opinion qualifies for 'controlling weight'"). Even if not entitled to controlling weight, a treating source's medical opinions are "still entitled to deference and must be weighed using all of the relevant factors." *Langley*, 373 F.3d at 1120 (alteration and quotation marks omitted); *see* 20 C.F.R. § 404.1527(c) (setting forth the factors to be weighed, comprising (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors). If the ALJ rejects the opinions of a treating source in favor of a non-examining source's opinion, he must provide specific, legitimate reasons for doing so. *See Watkins*, 350 F.3d at 1301. The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." *Robinson*, 366 F.3d at 1082 (quotation marks omitted). An ALJ's failure to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and demonstrate that he has applied the correct legal standards in evaluating the evidence constitutes reversible error. *See Reyes*, 842 F.2d at 244. Additionally, if an RFC assessment "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at * 7 (July 2, 1996).

### III.　ANALYSIS

Ms. Brookshire raises numerous arguments on appeal, comprising: (1) the ALJ committed legal error in his consideration of Dr. Penland's opinions (Doc. 27 at 6-17); (2) the ALJ erred in his treatment of Dr. Farrell's opinions (id. at 17-19); (3) the ALJ erred in evaluating Ms.

Brookshire's claimed limitations caused by her symptoms (id. at 19); (4) the ALJ failed to consider relevant lay testimony (id. at 20-21); (5) the ALJ failed to comply with his duty to develop the record (id. at 21-22); (6) the ALJ's RFC is not supported by substantial evidence (id. at 23); (7) the ALJ erred in his determination of whether the jobs the vocational expert identified exist in significant numbers (id. at 23-24); and (8) the ALJ was not properly appointed to serve as an ALJ and therefore did not have legal authority to preside over Ms. Brookshire's case or issue a decision (id. at 24). The Court concludes that reversal is required based on Ms. Brookshire's first claim of error and therefore does not reach the merits of Ms. Brookshire's other arguments.

**A. The ALJ Committed Legal Error in Weighing Dr. Penland's Medical Opinions**

   **1. The ALJ Erred by Failing to Perform a Threshold Controlling-Weight Analysis**

The ALJ's decision fails to demonstrate that he applied the correct legal standards for evaluating the medical opinions of record, specifically those of Dr. Penland. Initially, the Court notes that the decision contains no indication that the ALJ performed a proper controlling-weight analysis with respect to Dr. Penland's opinions. While recognizing Dr. Penland as an "acceptable medical source" and Ms. Brookshire's "treating psychologist[,]" the ALJ did not discuss whether Dr. Penland's opinions were well-supported and consistent with other substantial evidence in the record. Instead, he concluded that her opinions were not entitled to controlling weight based on the length of Dr. Penland's treatment history, which the ALJ found was "not long enough to establish a treatment history that would deserve controlling or even great weight." (AR 027.)

Before turning to the ALJ's error regarding performance of a threshold controlling-weight analysis, the Court briefly addresses the Commissioner's argument that this aspect of the ALJ's reasoning "was permissible in light of the fact that [Ms. Brookshire] only saw Dr. Penland on[e] time prior to her December 31, 2016 date last insured and given Dr. Penland's own note in her

opinion[,] 'I have not known this patient for very long. I just met her in December of 2016'[.]" (Doc. 29 at 11-12.) To the extent the Commissioner argues that the ALJ properly disregarded Dr. Penland's opinions because they were not relevant to the question of whether Ms. Brookshire established that she was disabled prior to her date last insured, *see Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993) (explaining that the claimant must prove she was disabled prior to the date her insured status expired), that argument fails for the following reasons.

First, the mere fact that Dr. Penland only treated Ms. Brookshire once before—and rendered her opinions after—Ms. Brookshire's date last insured is not itself a basis for discounting her opinions. Nothing in the regulations prevented Ms. Brookshire from submitting, and the ALJ from admitting and considering, evidence reflecting treatment she received after her date last insured if it bore the capacity to affect the ALJ's disability determination. Indeed, the regulations expressly contemplate admission and consideration of evidence of ongoing treatment and opinions based thereon so long as it is, *inter alia*, reasonably related to the time period adjudicated. *Cf.* 20 C.F.R. § 404.970(a) (providing that the Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision"). As the Tenth Circuit has explained, "evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date[.]" *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 479 (10th Cir. 1993) (alteration, quotation marks, and citation omitted). Here, the evidence supplied by Dr. Penland's medical source statement and treatment notes relates directly to two of the three severe

11

impairments that the ALJ found Ms. Brookshire had during the relevant period: anxiety disorder and affective disorder. The record quite clearly establishes that Dr. Penland's treatment of Ms. Brookshire derived from, was related to, and occurred contemporaneously with Dr. Hall's treatment of Ms. Brookshire's mental conditions, conditions that were well-documented prior to Ms. Brookshire's date last insured. (*See, e.g.*, AR 355, 357, 401.) Moreover, Dr. Penland expressly related her opinions regarding Ms. Brookshire's limitations caused by those impairments to the time period adjudicated, explaining in her medical source statement that the onset of the limitations she assessed "[p]robably go[es] back to childhood[,]"[6] i.e., prior to her date last insured. (AR 427.) All of this establishes the pertinence of Dr. Penland's opinions to the ALJ's disability determination, making it not only proper but imperative for the ALJ to have considered those opinions in rendering his decision.

Additionally, the ALJ did not rely on the fact that Dr. Penland's treatment and medical source statement postdate Ms. Brookshire's date last insured as a basis for refusing to afford greater weight to Dr. Penland's opinions. There is no indication whatsoever that the ALJ questioned whether Dr. Penland's treatment records and medical source statement qualified for consideration. As just concluded by the Court, it cannot be reasonably said that Dr. Penland's opinions could be relegated on the basis that they did not constitute evidence pertinent to Ms. Brookshire's claim. In any event, the Court declines to entertain the Commissioner's post-hoc rationalization for supporting the ALJ's refusal to consider whether Dr. Penland's opinions were entitled to controlling weight. *See Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (explaining that

---

[6] Notably, this statement by Dr. Penland immediately precedes her statement that "I have not known this patient for very long. I just met her in December of 2016." (AR 427.) The Commissioner's Response omits any reference to that statement, which provides critical context for her subsequent statements regarding the length of her treatment relationship.

reviewing courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself").

Returning, then, to the ALJ's reliance on the length of Dr. Penland's treatment relationship with Ms. Brookshire as a basis for refusing to accord her opinions controlling weight, that is simply not a proper reason for declining to give a treating source's medical opinions controlling weight. A treating source's medical opinion is entitled to controlling weight, and indeed *must* be given controlling weight, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" of record. 20 C.F.R. § 404.1527(c)(2) (explaining that "[i]f we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight"); SSR 96-2P, 1996 WL 374188, at * 2 (July 2, 1996) (identifying the four factors that determine whether an opinion is entitled to controlling weigh as (1) the opinion comes from a "treating source," (2) the opinion must be a "medical opinion," (3) the opinion is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques[,]" and (4) the opinion is "not inconsistent" with the other evidence of record, and explaining that "when all of the factors are satisfied, the adjudicator *must* adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion" (emphasis added)). Only when a treating source's opinion is *not* given controlling weight is consideration given to, *inter alia*, the length of the treatment relationship. *See* 20 C.F.R. § 404.1527(c)(2) (providing that "[w]hen we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) [(length of the treatment relationship and frequency of examination)] and (c)(2)(ii) of this

section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining what weight to give the medical opinion"). The ALJ's decision fails to evince consideration of the applicable factors for determining whether Dr. Penland's opinions were entitled to controlling weight. Specifically, absent from his decision is any indication that he considered whether Dr. Penland's opinions were well-supported by medically acceptable diagnostic techniques and "not inconsistent" with the other substantial evidence of record.[7] Instead of considering these relevant factors, the ALJ relied on an improper reason for refusing to give Dr. Penland's opinions controlling weight. The ALJ's error in this regard is itself grounds for reversal because the Court cannot say that the ALJ complied with the correct legal standards for weighing medical opinions. *See Watkins*, 350 F.3d at 1300, 1301.

2. **The ALJ's Decision Fails to Demonstrate Application of the Correct Legal Standard for Weighing Non-Controlling Opinions**

Even assuming *arguendo* that the ALJ properly declined to afford Dr. Penland's opinions controlling weight, his decision fails to demonstrate that he evaluated her opinions in accordance with the correct legal standard for weighing non-controlling medical opinions. *See* 20 C.F.R. § 404.1527(c). While the ALJ was not required to explicitly discuss all six regulatory factors, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), his decision was required to evince— through the provision of "good reasons" for the weight he assigned Dr. Penland's opinions—that he at least considered all of the factors in determining what weight to give Dr. Penland's opinions. *See Watkins*, 350 F.3d at 1300 ("After considering the pertinent factors, the ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimately assigns the opinion." (alteration omitted) (citing 20 C.F.R. § 404.1527(d)(2))). It fails to do so.

---

[7] The Court discusses the specific deficiencies in the ALJ's consideration of the evidence and handling of Dr. Penland's opinions in detail below.

As noted previously, the only "reasons" the ALJ gave for discounting Dr. Penland's opinions were (1) the length of her treatment relationship with Ms. Brookshire, which the ALJ found was "not long enough to establish a treatment history that would deserve controlling or even great weight[,]" and (2) that "her treatment notes are not clear." (AR 026.) These are not legally adequate reasons for the ALJ to have rejected Dr. Penland's opinions.

First, "[t]reatment relationship" is only one of many factors to be considered in determining what weight to accord a medical source's non-controlling opinion. *See* 20 C.F.R. § 404.1527(c)(1)-(6). Indeed, this one factor is multifaceted and takes into consideration not only the length of the treatment relationship but also the frequency of examination, the nature of the treatment relationship, and extent of the relationship. *See* 20 C.F.R. § 404.1527(c)(2)(i) (providing that "the longer a treating source has treated you *and the more times you have been seen by a treating source*, the more weight we will give to the source's medical opinion" (emphasis added)), (ii) (providing that "[g]enerally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion"). Yet the ALJ's decision evinces consideration of *only* the length of the treatment relationship between Dr. Penland and Ms. Brookshire, not its frequency, nature, or extent. This itself constitutes error, particularly on the record in this matter.

Notably, although Dr. Penland had been treating Ms. Brookshire for only four months when she completed her medical source statement, she had seen Ms. Brookshire a total of eleven times during those four months, averaging one treatment session per week. (AR 401-22.) The frequency of Dr. Penland's therapy sessions with Ms. Brookshire matters, here, because as a result of the number of sessions they had during a relatively short period of time, Dr. Penland was able to obtain greater knowledge of Ms. Brookshire's social, family, relationship, work, and mental

health histories—as documented in her treatment notes—that informed her eventual diagnoses and other medical opinions regarding Ms. Brookshire's impairments. (*See* AR 401-21.) Importantly, Dr. Penland's treatment notes—which are not discussed in any meaningful way in the ALJ's decision—reflect that Ms. Brookshire disclosed to Dr. Penland pertinent information bearing upon the various mental impairments from which Ms. Brookshire contended she was suffering, i.e., information that provided Dr. Penland with "more knowledge" about Ms. Brookshire's impairments that should have entitled her opinions to "more weight" under the regulations. *See* 20 C.F.R. § 404.1527(c)(2)(ii). For example, Ms. Brookshire told Dr. Penland about both the physical abuse she suffered as a child and the domestic violence she suffered as an adult to which her PTSD is attributed. (AR 413-14, 418.) On more than one occasion, she told Dr. Penland about her inability to interact with others, panic attacks she experiences, and the difficulty she has expressing herself and understanding others, information that helped inform Dr. Penland's diagnosis of social anxiety disorder. (AR 405-07, 415.) Ms. Brookshire also described to Dr. Penland many other symptoms she experiences—e.g., "difficulty focusing[,]" "problems with retention," and "finding it increasingly difficult to enjoy her life"—that are relevant to the opinions Dr. Penland rendered regarding Ms. Brookshire's work-related mental limitations. (AR 405, 411, 412.) The ALJ's decision reflects no consideration of any of this evidence, evidence that not only is probative of the quality of Dr. Penland's treatment relationship with Ms. Brookshire—i.e., its frequency, nature, and extent—but also tends to undercut his primary reason for discounting Dr. Penland's opinions. The ALJ was thus not free to disregard this evidence. *See* 20 C.F.R. § 404.1527(c); *Clifton*, 79 F.3d 1010.

In addition to evincing failure to properly apply the treatment-relationship factor itself, the ALJ's decision contains no discussion reflecting consideration of other relevant applicable factors.

For example, in determining how much weight to afford Dr. Penland's opinions, the ALJ was required to consider the consistency of her opinions with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). His decision renders evident that he failed to do so. Tellingly, his decision never even mentions Ms. Brookshire's longtime treating psychiatrist, Dr. Hall, much less reflects consideration of the evidence supplied by her treatment records. (*See* AR 021-30.) As noted previously, Dr. Hall's records document her long-term treatment of Ms. Brookshire's various mental health conditions, the same or similar conditions to those diagnosed and treated by Dr. Penland.[8] (*Compare* AR 275, *with* AR 402.) Notably, Dr. Hall's earliest treatment record indicates that Ms. Brookshire reported that "she is not comfortable with people, people tell her she talks to[o] much[,]" that "she is not a team player because [it] is hard to understand others[,]" and that "at times she has problems expressing herself and making a coherent conversations [sic]." (AR 392.) Even after she had been treating with Dr. Hall for a year-and-a-half and reported improvements in her mood and daily functioning with the use of medications (*see* AR 362), Ms. Brookshire still reported being "concerned about being around people[,]" "frighten[ed] of leaving her house" (AR 359), and "concerned about working around people." (AR 355.) This evidence—which is unaccounted for in the ALJ's decision—tends to provide support

---

[8] As did the ALJ, the Court notes that Dr. Penland disagreed with Dr. Hall's diagnosis of autism disorder (Asperger's syndrome) and instead diagnosed Ms. Brookshire with social anxiety disorder. (*See* AR 027, 402, 407.) The Court acknowledges this seeming inconsistency but declines to rely on it as a basis for concluding that the ALJ's decision evinces proper consideration of the regulatory factors to be used in weighing Dr. Penland's opinions for two reasons. First, the ALJ did not offer this as a reason for discounting Dr. Penland's opinion. *See Haga*, 482 F.3d at 1207-08. Merely pointing out that Dr. Penland "does not believe that [Ms. Brookshire] had either Asperger's or Autism" (AR 027) fails to explain how Dr. Penland's opinion that Ms. Brookshire has social anxiety disorder and her related opinions regarding the limitations caused by that impairment are not consistent with the record. Second, an inconsistency as to one diagnosis does not necessarily mean that none of Dr. Penland's opinions are consistent with and supported by other evidence of record. Indeed, the ALJ found at step two that Ms. Brookshire's severe impairments include "[a]nxiety [d]isorders" (AR 024), indicating the ALJ's belief that the record supported diagnosis of that impairment. The Court fails to see—and the ALJ failed to explain—the relevance of any inconsistency between Dr. Hall's diagnosis of autism disorder and Dr. Penland's diagnosis of social anxiety disorder to the questions before it.

17

for Dr. Penland's opinions regarding Ms. Brookshire's marked social-interaction limitations and should have at least been considered as part of the ALJ's assessment of the consistency of Dr. Penland's opinions with the record as a whole. Again, the ALJ was not free to discuss and rely on decontextualized, cherry-picked evidence supporting his decision[9] to the exclusion of significantly probative evidence that undercut his findings. *See Clifton*, 79 F.3d at 1010. Here, that failure results in the Court being unable to say that the ALJ complied with the applicable legal standards for evaluating the evidence in this case.

As a final matter, the ALJ's other proffered reason for discounting Dr. Penland's opinions—that "most of her treatment notes are not clear" (AR 027)—is not only ambiguous but also a legally insufficient basis for rejecting her opinions regarding Ms. Brookshire's marked limitations in certain areas of work-related mental functioning. To the extent he found Dr. Penland's handwritten treatment notes to be illegible, he should have attempted to recontact Dr. Penland for clarification of her opinions. *See* SSR 96-5P 1996 WL 374183, at *6 (July 2, 1996) ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."); *Robinson*, 366 F.3d at 1084 ("If evidence from the claimant's treating doctor is inadequate to determine if the claimant is disabled, an ALJ is required to recontact a medical

---

[9] For example, the ALJ's decision contains numerous references to the medical records from Presbyterian Medical Services, where Ms. Brookshire was seen six times between August 2015 and January 2016 for treatment of a thyroid problem. (AR 027, 298-326.) The ALJ noted that those records indicated that Ms. Brookshire "appeared oriented to time, place, person, and situation[,]" that her "mood and affect seemed appropriate[,]" and that "she showed normal insight and judgment." (AR 027.) While facially tending to support the ALJ's finding that Ms. Brookshire's claims about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical evidence, the probative value of the cited evidence is significantly reduced when considered, as it should have been, in context and vis-à-vis the record as a whole as demonstrated herein.

source, including a treating physician, to determine if additional needed information is readily available."). To the extent he found that Dr. Penland's treatment notes lacked substantive clarity, he also should have attempted to recontact her to seek clarification. *See Robinson*, 366 F.3d at 1084 ("If the ALJ concluded that [the treating doctor] failed to provide sufficient support for his conclusions about claimant's mental limitations, the severity of those limitations, the effect of those limitations on her ability to work, or the effect of prescribed medications on her ability to work, he should have contacted [the doctor] for clarification of his opinion before rejecting it."). The record contains no indication that any, much less every reasonable, effort was made to recontact Dr. Penland to seek clarification. Instead, the ALJ improperly relied on the purported lack of clarity of Dr. Penland's notes as a basis for effectively rejected her opinions.

On the whole, then, the ALJ's decision fails to demonstrate that he weighed Dr. Penland's opinions in accordance with the correct legal standards for weighing medical opinion evidence. As such, his decision must be reversed and remanded.

**B.     The Court Does Not Reach Ms. Brookshire's Other Arguments**

Because the Court concludes that remand is required as set forth above, the Court will not address Ms. Brookshire's remaining claims of error. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand).

### IV.     CONCLUSION

For the reasons stated above, Ms. Brookshire's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 27) is GRANTED.

_____
KIRTAN KHALSA

19

United States Magistrate Judge
Presiding by Consent